Good morning everyone. The first case is Arnault v. O'Toole. Mr. Meisner. Meisner, am I pronouncing it correctly? Yes you are, your honor. If it may please the court, I am John Meisner. I'm here today on behalf of Mr. Arnault, Mr. Rubino, and Passport. I want to begin with the admonition of this court some 30 years ago in the admonition of the Supreme Court that constitutional questions that present difficult issues should not be decided except upon a full record and after an adequate hearing. We are here this morning to address three errors of the district court. First, it errors in granting the motions to dismiss because it is a Just make sure that what we have before us. Counts 4, 5, 7, 9, and 11. They're not mentioned in your brief, so are you you're only focusing on 6, 7, 9, is it 6, 7, and 10? No, your honor. I believe it is 1, 2. Go ahead. First of all, count 1 was the first amount of retaliation by Mr. Arnault. I have you not mentioning 4, 5, 7, 9, and 11. And I believe that is correct, your honor. So you're focusing on 1, 2, and 3? I believe it was number 5. It was number 1, number 2, and number 5, the procedural due process on behalf of Mr. Arnault. No, 5 I have is not being mentioned in your brief, is that right? Maybe I'm wrong. You can maybe look at it just. I believe it's count 3 of the due process claim. That's what I thought. Okay. With respect to the First Amendment claim of Mr. Arnault, which was count 1, the district court erred because it is a question of fact as to whether there was a causal link between the protected petitioning conduct and the harm suffered by Mr. Arnault. Second, with respect to Mr. Arnault's due process claim. When your opponent says that the MTR's exercise of its First Amendment rights should not be attributed to Arnault, your response is? That in Gentile versus the State of Nevada, the Supreme Court made very clear that just because an agent is acting on behalf of his principal does not mean that that agent loses his First Amendment rights. Our complaint made very clear that on the three occasions when counsel for MTR was involved, he was acting as a licensed principal of MTR. And therefore, we believe that it is an error to try to distinguish between when the counsel is acting between counsel for MTR and also acting on behalf of Mr. Arnault, who is president, who is chairman, who is CEO, and who also as a principal licensee. Mr. Arnault did not lose his First Amendment rights when he became the president and CEO of MTR. And moreover, I think that when we look at the record as a whole, it's very obvious that the retaliation was directed to Mr. Arnault. Could you refine that a little bit? Is it the case that in every instance where an attorney is representing a client, that attorney may be advancing the client's First Amendment rights? Yes, absolutely. And I think that that lawyer retained some First Amendment rights as well. I think, quite frankly, we've looked at the law and there isn't a lot of guidance from either the circuit or the Supreme Court, but it doesn't make sense that Mr. Arnault would not have First Amendment rights simply because he is an officer of a corporation, especially when his rights are implicated as a principal licensee of that same entity. What is the causal link here? The causal link is when you look at the record as a whole. The first activity that Mr. Arnault engaged in was that in November of 06, he objected to an agent's very onerous request for records going back from the years 2000 to 2006. When Mr. Arnault's agency responded to that, they found out that that was never authorized, that that agent had no right to request that information, and so they withdrew it. What followed next within several months is that that same person, Mr. Crenny, he served a burdensome subpoena on MTR. And what it did is sought all sorts of records related to a security chief in Erie that was going to be there for one more month, but in fact they asked for every single record coming out of that department. Now Mr. Arnault then directed counsel to object to that, and within several months his counsel went to the PGCB and met with the executive director and the general counsel and lodged this complaint. What happened two months later? Those very same agents who had been working with Mr. Arnault, they contacted a vendor and they told the vendor that Mr. Arnault had surreptitiously, through third parties, funneled campaign contributions in violation of federal and state law. Well I think when you look at the record as a whole, I think that's a question for a jury. I think we're entitled to discover all the facts of that and present it to a jury and let them look at the record as a whole. The problem with retaliation is it doesn't come the day after you engage in protected activity. It comes when the opportunities present themselves. And the opportunities presented themselves to the BEE, like in the summer, right after they complained about this onerous request by Mr. Craney, what happened? They go out and defame Mr. Arnault. Now the question is how do we know that they understood this conduct to be imputed to Mr. Arnault? First, I believe that also to be a question of fact. But second, that should be gleaned from the record as a whole and the trier of facts should be able to determine that. If I can continue on this progression, what happened is, okay, so they defame Mr. Arnault. Mr. Arnault goes and complains again. What happens? They actually write a letter to Mr. Arnault saying that our files reveal no basis in fact for what that agent has said to that vendor applicant. Let me ask you, I'm trying to, in causation, there is a long timeline. So when the July 2007 discussions took place with Mr. Byte, B-E-I-G-H-T, there was no complaint filed at that time. And then, I assume you'll get to May of 08, the BIE issued a report of investigation recommending that denial of the license renewal. Nothing filed then. In January of 2010, the OEC issued the denial recommendation. And that is the only thing that's within the two-year period, isn't it? It is, but I think the rest is probative of the retaliatory conduct and of the intent of the government. Then why wasn't something filed before? There's a very practical reason, and that was that at that time Mr. Arnault was having his license renewed. So he wanted to be sure he got the renewal before. Nobody goes against the regulators. That's one of the things that you really have to understand in the real world how this actually happens, Your Honor. I want to correct something, and maybe our briefs didn't make it clear, but after the vendor interview, within two months, Mr. Arnault protested that conduct through his counsel. So it wasn't another year. What happened five months later was this initial report of investigation was drafted. Now, Mr. Arnault was not aware of that fact until it came time for his hearing in May of 2010. Is that the five-day hearing, as I understand it? Yes, Your Honor. I mean, I thought that would be sufficient to satisfy any constitutional concerns. He had a five-day hearing before the renewal in which he was permitted to present all manner of exhibits and arguments. But that was only after his liberty interest had been violated. The Constitution tells us when we have a liberty interest at issue, the question becomes what processes do. This Court in the Supreme Court has made it abundantly clear that when a pre-deprivation hearing is possible, it must be conducted. What should have been done? I don't understand this. Number one, there was no obligation on behalf of the OEC to release anything to the public. What should have been done is Mr. Arnault should have been notified privately that they were going to object to his recommendation, and then there should have been a hearing conducted. There should have been nothing released to the public to destroy this man's good name, calling into question his honesty, his integrity, and his character. All that are essential to be involved in the gaming business without giving him notice and an opportunity to be heard. The courts have been very clear. There are only two exceptions to when a post-deprivation hearing can be acceptable. Number one, if there are exceptional exigent circumstances, that was not present here. Number two, those line of cases dealing with public employees. When we recognize that the government has a unique interest in being able to manage and discipline employees, in communicating that to the public, Mr. Arnault was not a public employee. There were no exigent circumstances. No government interest has been served or was served by the publication of this denial recommendation. If you look at the statute in the regs, there is nothing, nothing, nothing that even mentions this document referred to as Notice of Recommendation. And if you were to buy the other side's argument that somehow they had an obligation to publicize this, all they needed to do was to publicize one sentence, and this was on their last page, and that is that the BIE objects to the Board's approval of this Edison Arnault application and the Office of Enforcement Counsel will recommend it be denied. If there was anything that needed to be published, that's all that needed to be said. It didn't need to be said, which he subsequently proved, was that his inaccuracies and inconsistencies called into question his character, his honesty, and his integrity. If you could turn to Mr. Rubino's First Amendment claim. Yes. And address why, under Keystone, there's not clause in judicial immunity for the persons involved here. I would like to begin because of what you wrote in Hamilton, Your Honor, that when we get into quasi-judicial immunity, which is a very, very, very harsh remedy, and there is a presumption against it, it is an intensely fact question. In Keystone, the issue addressed by this Court was whether when the PGCB grants a license pursuant to a statute with very specific criteria that allows for a direct appeal to the State Supreme Court, they enjoy quasi-judicial immunity. But, as this Court has pointed out before, that's an intensely factual issue. What are the facts here? There was no correctability of any sort of deal. As our brief makes very clear, they first issue an order saying we have 30 days to appeal to the Commonwealth Court. We take it up to the Commonwealth Court. The Commonwealth Court says, we need some clarifications about this because it does not appear to be a final order. Throughout your briefing, you argue that because the commissioners had improper motives for their conduct, they shouldn't qualify for quasi-judicial immunity. But haven't we said that we don't look at the commissioners motives? We don't look at the motives. We don't, Your Honor. But what we do is we need to conduct a factual inquiry about this whole process. Remember, Mr. Rubino was told that he was going to have a hearing, a hearing that was never conducted. The rules say that when you have a documentary hearing, there's all things that get to occur at that. How does that disqualify them from immunity? Well, because one of the things we have to look at is the procedural safeguards is one of the buts factors, Your Honor. And the buts factor says that, among other things, is it correctable on appeal? And they say that is the most important one. Mr. Rubino was intentionally denied any sort of judicial review, and it was done intentionally.  Precedent played no role in either what the hearing officer did or what the PGCP did. If you look at the rules, the regulations, the case, there's nothing that tells you how do you get this ban lifted, especially a ban that not only prohibits you from working with MTR, but prohibits you from representing third parties, people that want to buy property from MTR. And the third factor about why immunity wouldn't be appropriate here is because there was absolutely no institutional safeguards against improper conduct. All right. What about the stigma plus something additional, a plus factor that would impact on some other additional right? What is it here? I think this is comparable to the Valmont case because every applicant, whether it's in Nevada, New Jersey, Pennsylvania, has to fill out an application required by the PGCB. And that application is going to ask you whether you've ever had involved in a proceeding, whether there's ever been a recommendation of denial, whether you've ever been denied. Employers in the gaming industry are then required to look and investigate that. That's number one. Number two is we need to look at what happens when you don't respond. And the letter makes very clear that if you do not respond to this and request a hearing, a default will be entered against you, and you will be banned from participating in gaming activity or applying for a license for five years. So once that stigma is out there... What happened here? What is the other right that was abridged? Well, the plus. What is the plus? The plus was the fact that his legal status changed once he got this, because then he had to go through a hearing. And how did it end up? It ended up in his favor. But this is after the damage was already done, Your Honor. There was no reason that they couldn't have conducted a pre-deprivation hearing. And since a pre-deprivation hearing was possible, it was constitutionally required. It doesn't matter that some subsequent time... That's the plus factor here? The lack of a pre-deprivation hearing? No, the plus factor here is the change in his legal status, which comes once the Notice of Recommendation is served, and you're required either to defend it or be subject to a five-year ban. And that's exactly what the PGCB has done for other people that have not responded, and the fact, Your Honor, answering the question about what the plus is, is that now everybody... First of all, you as an applicant have to disclose this fact, and now all the applicants, as a matter of law, look into these because they go to your background suitability. So that is the plus for the stigma plus of our argument here. But that's part and parcel of the stigma. I mean, if there's a stigma, the next party down the road is going to say, hmm, there's a stigma, I better look at this. But what's the plus? What's the additional thing that goes... The plus is that his legal status has been altered once the OEC objects to his renewal because now he must engage in a legal process or risk being banned from the... That's the deprivation of a right... No, the deprivation... ...that he has to engage in the legal process. No, the deprivation of his right was his protected liberty and interest to his good name and his reputation that he had built up over a lifetime. The plus was the change in his legal status that comes once this notice is served on you and you have to engage in the legal process or... We understand that. Good. Thank you. Thank you very much. I'll have you back on rebuttal. Thanks so much. Good. Mr. Rosengart? Good morning. If it pleases the court, my name is Lee Rosengart and I'm here on behalf of the Pennsylvania Gaming Control Board Commissioner Defendants and Employee Defendants. The appellees have allocated time among themselves. I have five minutes to speak to the panel this morning. And I want to start with the Keystone Redevelopment Partners case. Judge Ambrose was on that panel. The decision was in 2011 and that stands squarely for the proposition that the PGCB commissioners have absolute quasi-judicial immunity for the actions that they take in a case such as this. Let me ask you just as a factual question leading up to that. What was the reason for the commissioners holding Rubino's petition in advance? I didn't... I just sort of... It's like they decided not to decide? There's no record, Your Honor, with regard to what the commissioners' thinking process was. But the commissioners told Mr. Rubino that before they would decide that issue, he had to file an application which the regulations required him to do at the time. And he steadfastly refused to file an application for a license. How long was the application pending? How long was the period from the time he applied to the time it was acted on? Well, SOC 58 was dated December 2006 and it was signed by Pres. Kyle Downs and Mr. Arnault in August of 2007. And the adjudication and order was September 2nd, 2009. And that's when the commissioners told Mr. Rubino that he had to apply for a license before they would decide the issue of whether SOC 58 would be lifted. And Mr. Rubino didn't do that. The fact remains that as of that time... Is that a normal period to review an application to tell Mr. Rubino in December 2008, by the way, you have to apply for an application? Well, the report and recommendation was September 2009, but the adjudication... I'm sorry, the adjudication and order was in September of 2009, but the report and recommendation of the hearing officer was January 30th, 2009. So there was nine months between the report of the hearing officer and the adjudication issued by the commissioners, and that certainly seems like a reasonable period to elapse between the hearing officer's report and her recommendation and the adjudication and order of the Pennsylvania Gaming Control Board. So we see that in the Keystone redevelopment... While we're on SOC 58... Yes, Your Honor. Why does Rubino need vendor certification in order to challenge that? Rubino needs to file an application for vendor certification in order for the Pennsylvania Gaming Control Board to address his character, honesty, and integrity, which are the elements of the Gaming Act that relate to his right to do business. That sort of seems like at the base of this. I mean, there's some concern about Mr. Rubino. There obviously is some concern about Mr. Rubino. He's told that in order to illuminate that concern and examine the issues, he's got to file an application, and he doesn't. But he's challenging the condition, and it applies to him, and it affects his actions in the future and with whom he can deal and the amount of money he can make, etc., the type of business he can do. Why does he need to file a vendor certification in order to be able to do that? Because his request, Your Honor, was that he be granted permission to do business with Presque Isle. And SOC 58 related to the decision by the regulators that he not be so permitted. They said in order to shed light on the issues relating to SOC 58, he would have to file a complete application for a vendor license so that they could get the information that they needed, and he could present his side of the case. They obviously had information. But SOC 58, I mean, if somebody says, look, as a condition, Ambrose, for your being able to go forward, you can't have anything to do with Rosengarten. And nothing to do with Rosengarten or any company controlled by Rosengarten. Why can't Rosengarten in that instance say, wait a minute, folks. I object. The commission had information, one must presume, that called into question Mr. Rubino's qualifications for doing business with Presque Isle and for being a licensee under the Gaming Act. And the fact is that the way that they chose to illuminate the facts was to have Mr. Rubino file a complete application and show his integrity and honesty and his suitability for a gaming license. So by that point, hadn't Arnaud and Rubino kind of fallen apart? I mean, in effect, and if that's the case, if my timing is correct, then Rubino sort of hung out the dry. He can't come in until he files a vendor certification and he can't really rely on Arnaud because they're no longer as close as they once were. Your Honor, the fact is that as of a time in 2008, which predates all of this, predates the report and recommendation and it predates the adjudication and order, the rules relating to applications changed and Mr. Meisner knows that because he was a member of the Independent Regulatory Review Commission and that commission issued a letter saying that it had no objection to the change in the rules which made Mr. Rubino free to file the application without going through Presque Isle dams. And if one were to look at the Pennsylvania Bulletin issued on May 17, 2008, volume 38, number 20 at 2251, you will see that the rule changed and that it did not require, it did not need the assistance of Presque Isle dams to file the application. Mr. Rubino was free to file it himself. Your time is running. I thought you were addressing, you started out addressing the immunity issue and I thought you might go back and touch on that because it seems to be important. The immunity of the board commissioners, could you specify why Keystone is dispositive of that? And also, we'd like you to get into the pre-deprivation hearing issue as well. Very well, Your Honor. The Keystone opinion stands for the proposition that the Pennsylvania Gaming Commission board is shielded from actions such as these by reason of the quasi-judicial nature of the function that they perform. We're not looking at motive, we're not looking at the particular act, we're looking at the function that they perform and all of the safeguards that were in existence in Keystone were in existence here. Chapter 58 of the Pennsylvania Code required notice to Mr. Rubino, required a public hearing, allowed for him to be represented by counsel, allowed for discovery, allowed for sworn testimony and documentary evidence, prohibited ex parte communications, provide for a transcript, requires the hearing officer to issue a report and recommendation from which there was an appeal taken and there was an adjudication from which there was an appeal taken and there was a Commonwealth Court opinion. This all looks very much like a judicial proceeding and the commissioners were acting in that capacity when they issued their adjudication and order in September 2009. Why shouldn't there have been a hearing ahead before this time? Well, Your Honor, I think there wasn't a hearing before this simply because Mr. Rubino needed to file an application. It is a privilege to have a gaming license in Pennsylvania. It is not a right and in order to have a gaming license you have to jump through certain hoops and Mr. Rubino, one must assume obviously concerned about what would be uncovered if he filed an application, declined to do so and he was repeatedly asked to file an application and he didn't do that and the commissioners believed that in order to adjudicate the issue they needed to see what Mr. Rubino's position was on the issues of integrity and he obviously felt that he couldn't pass muster there so he wouldn't file an application. Any further questions? At what point, you know, taking from Keystone, at some point can't commissioners do something that is so outside of their authority that they don't get quasi-judicial immunity? I mean, put yourself, you're writing this opinion. Well, Forrester says you can't harass an employee for sexual favors. That's really a different set of circumstances. So there is a point where, hey, you've gone beyond the bounds and what is it? Well, it's not adjudicating, Your Honor. If it's doing something other than adjudicating or acting in an adjudicatory function then I think you have the question raised. You know, the judge in Forrester was harassing this poor woman and asking for sexual favors. He claimed quasi-judicial immunity when a harassment case was brought and the Supreme Court said, well, no, that's not a quasi-judicial function that he's performing. It's administrative. But these commissioners were acting in an adjudicatory fashion much like a judge when they decided to file an application for licensing before they would decide the issue of SOC 58. It looks like, talks like, walks like, smells like an adjudicatory function and the Keystone case is squarely... It circles back to the question I had asked earlier. If they decided to hold Rubino's petition in abeyance, were they really acting within their adjudicatory function? I think they said to Mr. Rubino, before we can address SOC 58, we need to have a full picture to understand what's behind this. And in order to get that, you have to file a gaming application. And Mr. Rubino, obviously concerned about what the filing of a gaming application would disclose to the commissioners, declined to do that. He had it... He held up the application and said, we have a gaming application process for improper motives and improper reasons. They would not be entitled to immunity. Well, but the Keystone Redevelopment Partners case and all the cases that it relies on say that improper motive is not a topic that we can examine when we consider absolute quasi-judicial immunity. That the motive of the actor is not at issue. Not the motive. Anything else? Good. Thank you very much, Mr. Rosengart. Thanks to Goodman. Good morning, Your Honors. My name is John Goodman and I represent the five gentlemen referred to in the briefing as the BIE defendants. The BIE is the Gaming Board's Bureau of Investigation Enforcement and their job is basically to conduct investigations of gaming applicants. Why don't you just ask the question at the outset. Why do we draw a distinction between Arno and MTR, the company that he controls? Why do we draw a distinction? In what regard? Between First Amendment protected actions. You're saying that this was MTR, it wasn't Arno, but... Well, I mean... And I believe if you look at the judge's opinion, the one of the alleged protected activities, only one had to deal with Arno. Whether Mr. Creaney subpoenas records from Presque Isle or MTR that have nothing to do with Mr. Arno, I mean, Mr. Arno doesn't get First Amendment protection there. I mean, and when does it stop? If the CEO gets it, does the Vice President get First Amendment protection? Just because when the counsel acts on behalf of the company, he's acting on behalf of the company. These were corporate grievances, except for the one grievance that had to do with Mr. Arno personally, and that had to do with the Byte interview. Therefore, I don't believe Mr. Arno's counsel acting gives Mr. Arno the First Amendment protection rights. But Arno, it took him a long time to get the license renewal, didn't it? Yes. Well, I mean, he had to go through the process, the state process. There was an investigation, then it was my clients to not control that process. After we issued a Notice of Recommendation of Denial, our job is to do an investigation, give our best opinion based upon all the facts we have, and then say, here's what we think. We don't think Mr. Arno satisfied his burden of proving to us and to the board by clear and convincing evidence that he's suitable for a gaming license. That decision was made public, wasn't it? It was not made, well, you asked about the RRI being public, that wasn't public because that was an internal investigation. Whenever my clients go out and meet people and investigate people, they write internal reports. That decision is moved forward, isn't it? Well, then the reports are gathered together to Mr. Creaney. Mr. Creaney then gathers the reports and he does a recommendation based upon all of the reports. He then sends it to Mr. Arno and the board. Then the board has to do it. The board is then statutorily required to make all reports that are confidential pursuant to the Gaming Act. You know from the beginning that according to this process you outlined, it's going to get to the board and in that sense it's going to be made public. No, the Gaming Act specifically requires the board to make confidential, all confidential information. They are to redact all confidential information. If you look at the briefing in Mr. Arno's brief, he puts on page 25, quote, the areas of concern were redacted on copies of the letter distributed to the public by the board. In his reply brief, page 3, Mr. Arno states, if the board did not make the denial recommendation available to the public before Arno had the opportunity for hearing, Arno's rights would not have been violated. In the first place, because he is just gathering information from various different investigations and then compiling a report, he then makes a candid recommendation and if they can't make it, if Mr. Arno's case goes forward, basically the BIE and the OAC can never issue a notice of recommendation of denial or else they're going to say, you basically targeted me, you singled me out, that you recommended for me and all we do is we do the recommendations then we turn it over to the board. It's in the board's hands. If it got public, it was not Mr. Creany, we had nothing to do with it getting public and there's no allegations that we had to do with it getting public and to the extent the judge found that Mr. Creany should have known it was going to get public, yes, but he should have known it was safe for him to assume it was going to get public consistent with the Gaming Act and the Gaming Act requires confidential information be redacted. In this case, it was redacted. All the 12 areas of concern regarding Charlie Sacco, regarding Mr. Arnault admittedly having a business relationship with someone who apparently has mob ties, may or may not have mob ties, who was telling my clients, listen, I was getting illegal payments. Here's what they were doing, they were funneling payments through me. This is the information my guys have. So my clients write the report and they turn it over to the board and say, listen, there are some red flags here. I do not think Mr. Arnault proved to us as he is statutorily required to do, he did not prove to us that he is suitable for a gaming license. Now Mr. Arnault, he wants this special process just for him and importantly, I would like to refer you to the Conn versus United States Third Circuit case and in that case, it says the procedural due process rules are shaped at the risk of error inherent in the truth-finding process as applied to the generality of the cases, not the rare exceptions. And I think we can all agree, Mr. Arnault's case is the rare exception. The allegations, he has all different types of allegations regarding everybody is out to get him and these reports and there's, I mean right there, it shows he even admits that to rebut my clients inaccuracies statements, he needed to go to MTR to get exculpatory evidence. MTR wouldn't give it to him. He then had to go to Mr. Rubino. Mr. Rubino then gave it to him. He then had to present it in a five-day hearing and after that five-day hearing, apparently the inaccuracies were cleared up. But my client was not in possession of all that information. Mr. Creaney was certainly not in possession when he wrote the recommendation of denial and so, therefore, I mean, if my clients could only make the recommendation on what they have and Mr. Arnault had the burden, he could have presented any evidence he wanted to my clients prior to my clients' recommendation of denial. It's his burden to prove to us that he's suitable. I assume he had access to all the information that you had gathered about him so that he had a chance to refute whatever information you gathered that was negative. I'm not sure if they vetted everything by him or not. I mean, that's not in the record and I'm not sure if they, I mean, they, there's the investigation process, they have to, they talk to your associates, your friends, they talk to everybody. So, to the extent one person says one thing, I don't think they have to go back to Mr. Arnault individually and have him clarify every point because that's the process. We get all the inconsistencies, we give it to the board. If Mr. Arnault wants, wants to challenge that, then he has the right to do a hearing and that's, this is the name, if, if, and Mr. Meissner was talking about the stigma plus, the plus, he comes up with a completely different argument. The plus, as Judge, as Judge McLaughlin found, was Arnault was relying specifically and solely on the negative implications that the recommendation of denial had on his employment prospects. That is the alleged plus here. And to the extent Mr. Meissner alleges that there is a whole line of cases that are completely different in employment context, the court's  in 1996, Ersic versus Township of Springfield, in that case, the plus was the golf pro who said, I can't get further jobs. So he's alleging the same exact plus as Mr. Arnault has. So for Mr. Arnault to say that these employment cases are in a different context is just simply wrong. In fact, this court's holding in Hill versus Township of  in that case, the claim that the employment who was defamed satisfies the stigma plus due to your loss of the property interest of the job. That was the first time I'd ever had it. So in Graham, the court said, we're not going to decide this issue. In 2006, the court finally decided, okay, we're going to give this at-will employment the plus property interest. It didn't say all deprivation, that this is going to be treated differently than all other constitutional liberty interests that are deprived. There's no case law for that. That's  the court said. Any other questions? Thank you very much, Mr. Goodman. Mr. Sensikalsky. Good morning, your Honor. Henry Sensikalsky along with Fred Santorelli representing the NTR gaming group, Presque Isle Downs, Cicero Rodriguez Cairo, in-house counsel, James Stanton, John Bittner, Vincent Azzarello, Robert Griffin, and David Hughes. I agree with Mr. Rosengaard and Mr. Goodman there's no constitutional violation here. There's no conspiracy alleged in this complaint. There's no conspiracy in the record. Beyond generic allegations in the complaint the defendants conspired there's no even attempt to allege any kind of agreement between any of my clients. And then he goes on to say are those conspiracy claims against MTR defendants fair or no better? Against most of my clients there are de minimis specific factual allegations. Griffin Hughes, a few of the others, there are no constitutional violations. I respectfully think it's an alternative holding. If you look at pages 72 and 73 of his opinion, he specifically makes the two quotes I just read to the court. Even if there was a constitutional violation, there still has to be an agreement somewhere in his complaints. Or at least enough facts that would lead you to infer an agreement. What is here is basically, and you can scour the record, Mr. Meisner doesn't disagree. He alleges some ill will between certain MTR people and Mr. Arnault. Not particularly surprising. He alleges that some of the MTR people did not do what Mr. Arnault or Mr. Rubino wanted. They didn't speak up at the hearing. He claims they didn't give him all the documents he wanted, although they gave him a substantial number of documents. He claims they have a desire to curry favor with regulators. That is exactly in the great western mining. The judges were accused of not doing what the plaintiff or appellant wanted them to do. As you found, the fact that somebody unilaterally has motives, there has to be something that says there is an agreement here. Even if we did what he says, which is we didn't produce all the documents he wanted, he never says we did that. Anybody from the board or investigators asked us not to do it. He got all the documents from Mr. Rubino. None of that suggests that there is any individual with the government. My clients are not state actors. They are  casinos. The only way, even if there is a constitutional violation, that they can be in it is if they made an agreement or at least an implied agreement that there is facts that you can find to go ahead and do something with a government that does not find anything regarding an agreement. With that, your honor, you need to affirm. Thank you. Any further questions? Thank you very much. Mr. Wolf. Good morning. May it please the court.  District Court dismissed count 10 where Arnaud and Rubino alleged  to violate their first amendment and due process rights. The District Court dismissed count 10 holding that Rubino's claims were barred by the two-year statute of limitations in addition to his holding that neither Arnaud or Rubino pled a constitutional deprivation. Judge Ambrose correctly noted at the outset of this hearing that the only claims at issue in this appeal are counts 1, 2, and  If these claims are properly raised, the conspiracy claim is barred by the statute of limitations. Appellants argue in their reply brief, as they did before the District Court, that the discovery rule tolls the running of the statute of limitations until August of 2010 because that was the first they learned of Ambrose's alleged involvement. The District Court considered an appropriately rejected application of the discovery rule, citing the 2002 memorandum opinion in Graff v. Coleman, 28, Fed Appendix 151, where Judges Skirica, Ambrose, and District Judge Pollack affirmed the District Court's dismissal of an untimely Section 1983 conspiracy claim, holding that, in general, the rule that a cause of action accrues upon discovery of the injury does not require that a plaintiff have identified every party who may be liable on its claim. And that is the conclusion   statute of  Thank you.  MILLER Thank you, Mr. Rowe. MR. ROWE Good. Mr. Meisner. MR. MEISNER No, we have one more. MR. ROWE Sorry. Yes. MR. MEISNER Yes.  ROWE I'm happy to be  this case, Your Honor. MR. ROWE But you don't want to give up your one minute. MR. ROWE Ronald DiNicola from Erie on behalf of Nicholas Scott, Scott's Bayfront Development, known as the Scott Defendants, and apropos of what just occurred, Judge Scott's opinion ruling that these private non-government state actors cannot be held liable on a respondeat superior basis under section 1983 and that the allegations against them are simply not, do not meet the standard of  Iqbal, or Fowler because there's no allegation they knew met or had any association with any of the government defendants. If any of the other claims of the other appellees are sustained with regard to their arguments as the constitutionality conspiracy and the like, we are not  hold them liable as to the Scott defendants if any of those are sustained. But in addition to that, based on the district court's ruling, there is no basis to hold them under count 10. And finally, we also agree that the issue has been waived. We are not even mentioned in the opening brief or the reply brief and we're perfectly satisfied with that. Any questions? Thank you very much, Mr. Dean Nicola. Mr. Meisner, we'll give you 10 minutes. In an exchange, I'll not count 10. I take it you're not pursuing, is that correct? No, but however, I want to make clear that the trial court only addressed the underlying constitutional claims. And if this court were to reverse, then the trial court would have to go back and reexamine the case.   think      going to go back and  the case. I don't think that's the case that we're going to go back and reexamine the case.   think that's the case that we're going to  back and reexamine the case. I don't